IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

DENISE WHITE,

*Defendant*.

Criminal Action No. ELH-19-0034
Related Civil No. ELH-20-3441

## MEMORANDUM OPINION

This Memorandum Opinion resolves several motions filed by defendant Denise White. The motions are rooted in defendant's convictions in 2019 for the offenses of bank fraud, in violation of 18 U.S.C. § 1344, and aggravated identify theft, in violation of 18 U.S.C. § 1028A.

On August 28, 2019, White entered a plea of guilty to the crimes of bank fraud and aggravated identity theft. ECF 69. She is currently serving a sentence of 96 months of imprisonment, dating from April 3, 2019. ECF 108 (Judgment). At sentencing, the Court also ordered restitution in the sum of $543,163.42, jointly and severally with codefendant John O'Day. *Id.* at 5-6.

White submitted a pro se motion for compassionate release in May of 2020. ECF 114. By Memorandum (ECF 130) and Order (ECF 131) of October 30, 2020, I denied that motion, without prejudice, because White had failed to exhaust her administrative remedies.

White, pro se, renewed her motion for compassionate release (ECF 140), supported by an exhibit. ECF 140-1. Thereafter, through appointed counsel, White filed a supplement to the motion (ECF 160), supported by several exhibits. ECF 160-1 to ECF 160-4. I shall refer to ECF 140 and ECF 160 collectively as the "Motion." The government opposes the Motion (ECF 163), supported by several exhibits. ECF 163-1 to ECF 163-4. White has replied. ECF 166.

In addition, White has filed a pro se motion for post conviction relief under 28 U.S.C. § 2255.  ECF 135.  Initially, she alleged ineffective assistance of counsel, on two grounds.  *Id.* at 4, 5.  In particular, she complained that her lawyer failed to address "factual inadequecies in the governments [sic] loss calculation . . . .", which impacted "the sentencing range," in violation of the "6th, 8th, and 14th Amendment[s]."  *Id.* at 4.  Further, she complained that her attorney "failed to consult" with her about an appeal.  *Id.* at 5.  However, White subsequently moved to withdraw those grounds for relief.  ECF 154.  Instead, she seeks a "complete forensic audit account pursuant to 15 U.S.C. 1692(g) [sic][.]"  *Id.*

I shall refer to ECF 135 and ECF 154 collectively as the "Restitution Motion."  The government opposes the Restitution Motion (ECF 175), supported by an exhibit.  ECF 175-1.  White has replied.  ECF 177.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion, without prejudice, and I shall deny the Restitution Motion.

## I.      Procedural and Factual Background[1]

On April 10, 2019, White and two codefendants were charged in a fourteen count Superseding Indictment in connection with a bank fraud conspiracy scheme.  ECF 22.  In particular, defendant was charged with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count One); bank fraud, in violation of 18 U.S.C. § 1344 (Counts Seven through Thirteen); and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Fourteen).

---

[1] Where appropriate, I have drawn on the factual background set forth in my Memorandum of October 30, 2020.  ECF 130.

Pursuant to a Plea Agreement (ECF 70), White entered a plea of guilty on August 28, 2019, to Counts Thirteen and Fourteen of the Superseding Indictment.  ECF 69.  She also agreed to pay restitution, not to exceed $552,192, jointly and severally with O'Day.  *Id*. ¶ 11.

The Plea Agreement contains a lengthy Stipulation of Facts.  ECF 70 at 11-14.  It provides, in part, that White was "appointed and sworn a notary public by the Superior Court of Georgia for Fulton County for a term beginning in January 2015 and expiring in January 2019."  *Id.* at 11. During that time period, White engaged in various fraud schemes, often involving the use of aliases and "the fabrication of documents," several of which contained "fake notary public stamps and forged signatures."

Between January 2017 and January 2018, White knowingly and intentionally participated in schemes to defraud at least six federally insured financial institutions and several individuals to obtain money owned by or under the control of the victim financial institutions.  Among other things, in collaboration with O'Day, a resident of Maryland, White submitted and secured approval for a series of fraudulent auto loan applications.  In connection with these schemes, White used false names, including "Lisa Young" and "Lisa White."  *Id.*

Specifically, White and her coconspirators submitted at least fifteen fraudulent applications for auto loans to the victim financial institutions, falsely identifying O'Day as the seller of various motor vehicles, which were falsely listed as collateral.  At least twelve of the fraudulent applications were successful and resulted in the disbursement of loan checks totaling approximately $553,192.  *Id*.

White and O'Day also used personal identifying information belonging to at least three individuals (including their names, dates of birth, and social security numbers) in fraudulent auto loan applications, without their permission.  *Id.* at 13.  Additionally, between 2017 and 2019, White

sent and received emails in which she procured, produced, and distributed copies of fake social security cards, driver's licenses, bank statements, earning statements, IRS Forms W-2, utility bills, home loan preapproval letters, insurance documents, and correspondence.  ECF 70 at 14.

By statute, Count Thirteen carries a maximum penalty of thirty years of imprisonment.  *Id.* ¶ 3.  Count Fourteen carries a mandatory term of imprisonment of two years, consecutive to any sentence imposed as to Count Thirteen.  *Id.*; *see also* 18 U.S.C. § 1344; 18 U.S.C. § 1028A.

In the Plea Agreement (ECF 70), with respect to Count Thirteen, the parties agreed to a base offense level of 7 under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines"), as well as the following enhancements: 14 levels because the loss exceeded $550,000 but did not exceed $1,500,000; 4 levels because the offense involved five or more victims; and 2 levels because the offense involved the possession of device-making equipment.  *Id.* ¶ 6.  The parties also contemplated a three-level deduction for acceptance of responsibility, pursuant to U.S.S.G. 3E1.1.  As a result, the Plea Agreement contemplated a final offense level of 24 for Count Thirteen. *Id.* ¶ 6(f).  The calculations in the Presentence Report ("PSR") are consistent with the Plea Agreement.  *See* ECF 83, ¶¶ 36-46.

Sentencing was held on November 15, 2019.  At the time of sentencing, White was 32 years old.  *Id.* at 2.  She stood five feet, eight inches tall and weighed 363 pounds.  *Id.* ¶ 68.  The PSR also detailed various health conditions of the defendant, including diabetes and high blood pressure.  *Id.*

The PSR reflected that White had seven prior adult criminal convictions in Georgia, of which five scored points.  In particular, in 2005, at the age of 17, White was convicted of eleven counts of financial transaction card fraud.  *Id.* ¶ 52.  In August 2011, White was convicted of first-degree forgery for crimes she committed in 2008.  *Id.* ¶ 53.  A week later, White was convicted

for crimes she committed in 2010, which included financial transaction card fraud, giving false information to law enforcement, and several counts of identity theft fraud.  ECF 83, ¶ 54.  In 2013, White was again convicted for identity theft fraud.  *Id.* ¶ 55.  And, in 2016, White was convicted of financial transaction fraud for a third time for crimes she committed in 2015.  *Id.* ¶ 56.

White's criminal history yielded a subtotal criminal history score of 11.  Two points were added because, at the time the instant offenses were committed, White was on probation.  *Id.* ¶ 58. Thus, as calculated by the PSR, White had a total criminal history score of 13 points, yielding a criminal history category of VI.  *Id.* ¶ 59.  However, at sentencing, the Court granted a downward departure to a criminal history category of V.  ECF 119 (Sentencing Transcript) at 21.

With a final offense level of 24 and a criminal history category of VI, the Guidelines for Count Thirteen called for a period of incarceration ranging from 100 to 125 months.  But, with a criminal history category of V, the defendant's Guidelines range was 92 to 115 months.  And, as noted, Count Fourteen required mandatory a term of 24 months, consecutive to Count Thirteen. ECF 83, ¶ 76.  Thus, with a criminal history category of VI, the total Guidelines range called for a period of incarceration between 124 and 149 months.  And, with a criminal history category of VI, the range was 116 to 139 months of imprisonment.

The Court imposed a sentence of 72 months of incarceration for Count Thirteen, which was well below the reduced Guidelines range.  And, as required, the Court sentenced White to a consecutive term of 24 months as to Count Fourteen.  This yielded a total term of 96 months of incarceration, followed by five years of supervised release.  ECF 108.  In addition, consistent with the Plea Agreement, the Court ordered restitution in the amount of $543,163.42, jointly and severally with codefendant O'Day.  *Id.* at 5-6.

Of import here, the Judgment specified, *id.* at 6 (emphasis added):

5

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid: on a nominal payment schedule of $100.00 per month during the term of supervision, to commence sixty (60) days upon release from imprisonment.  However, the U.S. probation officer may recommend a modification to adjust the payment schedule if the defendant's financial circumstances warrant an adjustment.  The defendant is to pay interest on the restitution amount.  *It is also recommended that the defendant participate in the Bureau of Prisons' Inmate Financial Responsibility Program*.

The Inmate Financial Responsibility Program (the "IFRP") is "a work-program instituted by the Bureau of Prisons to encourage 'each sentenced inmate to meet his or her legitimate financial obligations.'  The program provides for development of a financial plan that allows inmates to pay certain enumerated obligations, including court-ordered assessments, restitutions, and fines."  *Montano–Figueroa v. Crabtree*, 162 F.3d 548, 548 (9th Cir. 1998) (per curiam) (quoting 28 C.F.R. § 545.10), *cert. denied*, 526 U.S. 1091 (1999).

In the Plea Agreement, White waived many of her rights to appeal.  ECF 70, ¶ 10.  And, no appeal was filed by White, either as to the sentence or the amount of restitution.

White is currently incarcerated at the Federal Correction Institution, Tallahassee ("FCI-Tallahassee").[2]  *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited October 14, 2022).  The Bureau of Prisons ("BOP") indicates that she has a projected release date of April 30, 2025.  With credit for pretrial detention dating from April 3, 2019, White has served about 30 months of her 96-month sentence, or approximately 30% of her sentence.

In her Motion, White asserts that her conditions of obesity, hypertension, and diabetes render her particularly vulnerable to COVID-19 and thus constitute an extraordinary and compelling reason for her release.  ECF 140 at 3.  The government counters that White has not demonstrated extraordinary and compelling reasons that would make her eligible for a sentence

---

[2] White requested service of her sentence at this facility.  ECF 119 at 53-54.

reduction because "she has refused vaccination for COVID-19 and has contracted the coronavirus and recovered from it[.]"  ECF 163 at 1.  Moreover, the government maintains that the balance of the sentencing factors in 18 U.S.C. § 3553(a) supports a denial of the requested relief.  *Id.* at 33-35.

As noted, White also filed a motion to vacate pursuant to 28 U.S.C. § 2255.  ECF 135.  White initially claimed that her sentence should be set aside, vacated, or reduced due to ineffective assistance of counsel, on the following grounds: (1) "failing to resolve factual inadequacies in the government's loss calculation for sentencing"; and (2) "fail[ure] to consult [defendant] concerning the advantages and disadvantages of taking an appeal and to discover the defendant's appellate wishes."  *Id.* at 4-5.

However, White subsequently moved to withdraw both grounds.  ECF 154.  Instead, White asks the Court to "order a complete forensic audit account pursuant to 15 U.S.C. § 1692(g) [sic]."  *Id.*  She points out that the Court "ordered restitution for an amount of $553,000 [sic] when [defendant] only received under $10,000 from the loss."  *Id.*  The Court granted defendant's motion to withdraw and directed the government to respond to White's revised contentions.  ECF 173.

The government's opposition to the Restitution Motion is docketed at ECF 175.  It points out that the statute cited by White, 15 U.S.C. § 1692(g), does not exist, and that the "Defendant did not object to the entry of an order of restitution in the amount of $543,163.42 at sentencing."  *Id.* at 5, 6.  Additionally, the government argues that the implication that the calculation of White's restitution should be based on the percentage of the proceeds she obtained in the criminal conspiracy is wrong.  *Id.* at 7.  Moreover, the government asserts that "a 'sentence that imposes an order of restitution is a final judgment' pursuant to 18 U.S.C. § 3664(o) and may only be modified under limited circumstances which are not present here."  *Id.* at 8.

Additional facts are included, *infra*.

## II.     Motion

### A.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022).  This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on*

*Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted her administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the court must find that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2) the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing Commission; and (3) on balance, the factors set forth in 18 U.S.C. § 3553(a) warrant a reduction of sentence.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[3] In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the

---

[3] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there

exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, ___ F. App'x ___, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to

consider intervening changes in the law and factual developments.  *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release. Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

As the movant, the defendant bears the burden of establishing that she is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As noted, even if the defendant establishes an extraordinary and compelling reason that renders her eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the

extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167. And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

## B. COVID-19[4]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5] COVID-19 spawned

---

[4] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease*

"a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life." Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, Reuters (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of October 19, 2022, COVID-19 has infected more than 97 million Americans. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed August 23, 2022).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

---

*and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In September 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (September 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease,

cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive."  *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.  Nevertheless, the Court may consider the CDC's identification of risk factors.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on

[sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health,

School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[6]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an

---

[6] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. Times (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. Times (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. Times (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. Times (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

"extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022),

20

https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of September 2022, approximately 68% of the total U.S. population is fully vaccinated, including 31% of people from ages 5 to 11, 61% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 92% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated September 29, 2022).  Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated October 4, 2022).  And, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18

years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE

CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-

19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical

Guidance  (Jan.  4,  2021),  https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It

provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with

[recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for

prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter

Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES

(Dec.  21,  2020),  https://www.forbes.com/sites/walterpavlo/2020/12/21/  federal-bureau-of-

prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of October 6,

2022, the BOP had 143,064 federal inmates and approximately 36,000 staff.  And, by that date,

the BOP had administered 330,593 vaccine doses to staff and inmates.  *See* BUREAU OF PRISONS,

https://www.bop.gov/coronavirus/ (last accessed October 6, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.

*See*  David  Leonhardt,  *Covid  Cases  Keep  Falling*,  N.Y.  TIMES,  Oct.  27,  2021,

https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html  ("The  number  of

new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the

magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the

trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See*

*Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION,

https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States.  It sparked further cause for concern, because it was highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.  Again, the country began to return to normalcy.

Unfortunately, that respite did not last long.  We soon experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.   In particular, in the spring of 2022 a new subvariant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."  *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.

However, in an interview on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. . . . But the pandemic is over."  *Id*.  On the other hand, news reports suggest that we may experience yet another surge of cases in the coming months.  *See*, *e.g.*, *Quick and stealthy 'Scrabble variants' are poised to drive a winter Covid-19 surge*, CBS NEWS (Oct. 20, 2022), https://www.cbsnews.com/baltimore/news/quick-and-stealthy-scrabble-variants-are-poised-to-drive-a-winter-covid-19-surge/.

As of October 14, 2022, the BOP reported that 187 federal inmates, out of a total population of 143,098, and 393 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 48,666 inmates and 14,206 staff have recovered from the COVID-19 virus. In addition, 308 inmates and seven staff members have died from the virus.  The BOP has completed 128,692 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI-Tallahassee, where the defendant is imprisoned, the BOP reported that as of October 14, 2022, out of a total of 883 inmates, zero inmates and zero staff members have currently tested positive, two inmates and zero staff members have died of COVID-19, and 389 inmates and 62 staff have recovered at the facility.  In addition, 100 staff members and 1,179 inmates have been inoculated with the vaccine at FCI-Tallahassee.  *See* https://www.bop.gov/coronavirus/;                BUREAU            OF            PRISONS, https://www.bop.gov/locations/institutions/btf/ (last visited October 14, 2022).

### C.  Discussion

#### 1.  Exhaustion

As a preliminary issue, I first discuss whether White has exhausted her administrative remedies.  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted her administrative remedies, she may petition a court directly for compassionate release.  *See, e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow

incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

On November 11, 2020, White submitted to the warden of FCI-Tallahassee a request for compassionate release based upon her vulnerability to serious illness as a result of underlying medical conditions and COVID-19.   ECF 140-1 at 3.   White reiterated the request for compassionate release in an "Informal Resolution Process" form, dated December 29, 2020, and asked for a response to the request.   *Id.* at 4.   And, in a "Request for Administrative Remedy," dated January 5, 2021, White states that she had "not yet received a response or any acknowledgement from either submission."   *Id.* at 5.

In the absence of any response from the BOP, the government assumes that White "has exhausted her administrative remedies for purposes of her Renewed Motion for Compassionate Release."  ECF 163 at 20.  Moreover, because 30 days have expired since the warden's receipt of defendant's request for a sentence reduction, White has satisfactorily pursued her administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A).

### 2.  Medical Conditions

I next consider whether defendant has presented the Court with an extraordinary and compelling reason for her release.  As mentioned, White contends that she is at an increased risk of severe illness from COVID-19 due to her underlying physical health conditions.  ECF 160 at 4. In particular, White's medical records indicate that she suffers from three conditions that the CDC identifies as risk factors for a more serious case of COVID-19: obesity; hypertension; and Type 2 diabetes.  ECF 160-2 at 2.

With regard to hypertension and Type 2 diabetes, the CDC is clear that these conditions render an individual more likely to get very sick from COVID-19.  *People with Certain Medical*

*Conditions*, *supra*.   Additionally, White has a body mass a body mass index ("BMI") of over 50. This qualifies her as obese under the CDC guidelines.  ECF 160-2 at 4.

Some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release, particularly when coupled with other chronic medical conditions.  *See United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *see also, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *Williams*, 2020 WL 3073320, at *1 (finding defendant with a BMI of 32.5 was obese and qualified for compassionate release given COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (finding defendant's age, diabetes, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

Moreover, as noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*. Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions such as those affecting White. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Oaks*, RDB-17-288, 2020 WL 3433326, at *3 (D. Md. June 23, 2020) (defendant with Type II diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis); *Hilow*, 2020 WL 2851086, at *4 (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020) (finding defendant's hypertension and diabetes qualified as extraordinary and compelling reason). There are also some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole

condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

The government does not contest that defendant's medical conditions, generally speaking, render her more vulnerable to COVID-19. Rather, the government indicates that White cannot be considered at risk from COVID-19 because she has refused vaccination and also because she already contracted the coronavirus and recovered from it. ECF 163 at 1.

A defendant's eligibility for compassionate release is not defeated because a defendant has had COVID-19. What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity." *See also United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible").

On the other hand, White's refusal to take the COVID-19 vaccine weighs against her, and substantially weakens her argument for compassionate release. As the government notes (ECF 163 at 23), and as defendant's medical records reflect (ECF 163-1), White declined an opportunity to receive the Moderna COVID-19 vaccine on January 20, 2021.

The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic." *Key Things to Know about COVID-19 Vaccines*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated July 20, 2022). And, I have previously joined a growing number of district court judges

across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to

obtain a COVID-19 vaccine significantly undermines the claim that her susceptibility to the effects

of COVID-19 constitutes grounds for compassionate release.

As Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal

to take preventative measures to protect oneself from COVID-19 undermines any assertion that

the risk of viral infection constitutes an extraordinary and compelling reason justifying

release . . . .  Any decision to the contrary would create a perverse incentive in favor of declining

the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow

prison operations to return to some degree of normalcy in the coming months."  *United States v.*

*Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United*

*States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021)

(reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May

3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June

3, 2021); *United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL 2269974, at *7 (D. Me. June 3,

2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021);

*United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United*

*States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting

cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021);

*United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

The vaccine is central to preventing dangerous mutations.  *See, e.g.*, *Another Reason To*

*Get Vaccinated? To Stop Variants From Developing*, HENRY FORD HEALTH SYS. (Sept. 27, 2021),

https://www.henryford.com/blog/2021/09/get-vaccinated-to-stop-variants.  Moreover, "vaccines

are the best way to protect yourself and others against COVID-19."  Dr. Francis Collins, *Latest on*

*Omicron Variant and COVID-19 Vaccine Protection*, NIH DIRECTOR'S BLOG (Dec. 14, 2021),
https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-
protection/.

In any event, I shall assume for present purposes that White's combined, underlying health
conditions constitute an extraordinary and compelling reason for a sentence reduction.
Nonetheless, the Motion fails.

### 3.  Section 3553(a) Factors

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v.
Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  Even when
a court finds extraordinary and compelling reasons for compassionate release, relief is warranted
under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C.
§ 3553(a).  *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2
(4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the
defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense,
promote respect for the law, and provide just punishment; (3) the kinds of sentences available and
the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to
avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*,
997 F.3d at 186.  The Court must also consider the factors set forth in 18 U.S.C. § 3142(g),
including the nature and circumstances of the offense, the history and characteristics of the
defendant, and the danger that release would pose to any person or the community.  U.S.S.G. §
1B1.13(2).

In my view, a balancing of the § 3553(a) factors indicates that defendant's release from
prison is not warranted at this time.  As the government notes, White's crime of conviction was a

serious one: she abused her position as a notary and participated in a complex and sophisticated fraud scheme involving numerous fraudulent auto loans, and contributed to losses of well over $500,000.  ECF 160 at 27.  Although White's crime was not a crime of violence, there is no question that the economic and emotional impact of her conduct continues to be felt by her victims today, some of whom lost retirement savings.  ECF 83 at 8.

Furthermore, defendant's criminal history is disturbing.  As the Court recognized at sentencing, White has led a life of ongoing and repetitive fraudulent activity that has only grown more serious and more damaging over time.  ECF 119 at 55.  And, despite a growing number of criminal convictions and sentences, a review of White's criminal history makes plain that the criminal justice system has repeatedly treated defendant with leniency.  See ECF 83, ¶¶ 50-56 Yet, that did not lead White to change her conduct; she continued to engage in criminal activity, which led to her federal prosecution in this case.

Finally, White has served only 30% of the sentence that this Court initially imposed.  ECF 108.  And, her sentence was well below the range contemplated by the Guidelines.  ECF 119 at 21.  To date, defendant has served only about 30 months of imprisonment for her role in a wide-ranging criminal conspiracy.  In my view, a sentence of this length does not adequately reflect the seriousness of defendant's crime nor promote respect for the rule of law.

Significantly, White has submitted numerous records that document the laudable efforts she has made to rehabilitate herself while incarcerated.  See ECF 176-1.  In particular, defendant notes that she has not incurred any disciplinary infractions during her tenure of imprisonment. ECF 160 at 9; see ECF 160-1 at 4 (disciplinary record).

The Court applauds White for her positive efforts to return to society.  But, "rehabilitation alone cannot serve as a basis for compassionate release."  Davis, 2022 WL 127900, at *1.  And,

this is not the "grievous case[]" warranting compassionate relief.  *McCoy*, 981 F.3d at 287.

Moreover, the Court remains troubled by the severity of defendant's offense of conviction, coupled

with her criminal history, her repeated failure to conform her conduct to societal expectations, and

the abbreviated duration of incarceration that defendant has served to date.  Thus, the Court denies

the Motion, without prejudice.

### III.   Restitution Motion

In the Restitution Motion, White asks the Court to order a "complete forensic audit account

pursuant to 15 U.S.C. 1692(g) [sic][.]"  ECF 154 at 1.  However, as the government notes (ECF

175 at 5), 15 U.S.C. § 1692 relates to the Fair Debt Collections Practices Act, which establishes

legal protection from debt collection practices by private debt collectors; it does not apply to the

government's collection of criminal restitution.  *See* 15 U.S.C. § 1692(e) ("It is the purpose of this

subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those

debt collectors who refrain from using abusive debt collection practices are not competitively

disadvantaged, and to promote consistent State action to protect consumers against debt collection

abuses.");  *see also* 15 U.S.C. § 1692a(6)(c) ("The term 'debt collector' . . . does not include any

officer or employee of the United States or any State to the extent that collecting or attempting to

collect any debt is in the performance of his official duties").

Rather, the relevant statute for the restitution order entered in this case is The Mandatory

Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, which requires defendants convicted of

certain crimes to pay restitution.   Specifically, 18 U.S.C. § 3663A(a)(1) provides: "[W]hen

sentencing a defendant convicted of [certain enumerated offenses], the court shall order . . . that

the defendant make restitution to the victim of the offense or, if the victim is deceased, to the

victim's estate."   Notably, the MVRA encompasses "an offense against property under this

title. . . including any offense committed by fraud or deceit[.]"  18 U.S.C. § 3663A(c)(1)(A)(ii).  And, in this case, defendant's crimes of conviction, bank fraud and aggravated identity theft, plainly qualify.

In accordance with the MVRA, the sentencing court was required to impose an order of restitution commensurate with the loss suffered by the defendant's victims.  Indeed, as the Fourth Circuit explained, "the MVRA mandates that the sentencing court order restitution in the full amount of the victim's loss . . . ."  *United States v. Leftwich*, 628 F.3d 665, 668 (4th Cir. 2010).

Rule 32 of the Federal Rules of Criminal Procedure is titled "Sentencing and Judgment."  And, in subsection (c), it requires that, prior to the imposition of a sentence, the probation officer must "conduct a presentence investigation and submit a report to the court . . . ."  Fed. R. Crim. P. 32(c)(1)(A).   Where "the law permits restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution."  Fed. R. Crim. P. 32(c)(1)(B).

The PSR, which was provided to defendant before sentencing, reflects an estimated amount of the victims' losses attributable to the conspiracy in which defendant participated.  ECF 83, ¶ 88.  Moreover, in White's Plea Agreement, she agreed "to the entry of a restitution order for the full amount of the victims' losses, which does not exceed $553,192."  ECF 70, ¶ 11.  And, at sentencing, White did not object to the government's calculations of the victims' losses, nor did she object to the entry of an order of restitution in the amount of $543,163.42.  ECF 119 at 23, 60.  As the government notes, "Defendant's criminal Judgment entered in this case, ECF 108, should serve as sufficient proof and validation of Defendant's debt."  ECF 175 at 6.

Furthermore, "the terms of the MVRA clearly dictate that a district court cannot remit a mandatorily imposed restitution order." *United States v. Roper*, 462 F.3d 336, 338 (4th Cir. 2006). Indeed, 18 U.S.C. § 3664(o) provides that an order of restitution is a final judgment except that:

> (1) such a sentence can subsequently be—
>
>> (A) corrected under Rule 35 of the Federal Rules of Criminal Procedure and section 3742 of chapter 235 of this title;
>>
>> (B) appealed and modified under section 3742;
>>
>> (C) amended under subsection (d)(5); or
>>
>> (D) adjusted under section 3664(k), 3572, or 3613A; or
>
> (2) the defendant may be resentenced under section 3565 or 3614.

These provisions do not entitle defendant to the relief she seeks. First, Rule 35 of the Federal Rules of Criminal Procedure provides, in relevant part: "Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." But, defendant did not file such a motion within fourteen days of sentencing. Moreover under 18 U.S.C. § 3742, a criminal defendant may file an appeal of a sentence imposed upon her. But, as mentioned previously, White did not note such an appeal.

Subsection (c) is similarly unhelpful to White. It indicates that a court may amend the restitution ordered in accordance with § 3664(d)(5) of Title 18 of the United States Code. It provides, *id.*:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

Significantly, the Supreme Court has clarified that the primary purpose of this subsection is "to ensure that victims of a crime receive full restitution." *Dolan v. United States*, 560 U.S. 605, 612 (2010).  Nonetheless, at least some courts have determined that this subsection, "read together with FRCRP 32(c), does protect a defendant's right to due process by requiring that a defendant be given an opportunity to object within 90 days after sentencing to the amount of restitution ordered." *United States v. Young*, 1:10-cr-00006-TBR-2, 2012 WL 4023773, at *2 (W.D. Ky. Sept. 12, 2012) (citing *United States v. Vandeberg*, 201 F.3d 805, 813-14 (6th Cir. 2000)).  In this case, there is no indication that White or any victim of the conspiracy petitioned the Court within ninety days of sentencing.  Therefore, 18 U.S.C. § 3664(d)(5) cannot afford defendant any relief.

With respect to the provisions referenced in 18 U.S.C. § 3664(o)(1)(D), including 18 U.S.C. §§ 3572, 3613A, and 3664(k), they do not apply here.  Section 3572 merely provides guidance on the factors a court should consider in imposing a fine; it does not confer any authority on the district court to modify the amount of such a fine previously imposed. And, although 18 U.S.C. § 3613A authorizes a court to take certain actions in the event of default by the defendant, including modification of the payment schedule, it does not empower a court to modify the amount of restitution ordered.

As to 18 U.S.C. § 3664(k), it empowers a court to adjust the *payment schedule* of a restitution order where a defendant demonstrates "any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution." *See also United States v. Banks,* 430 F. App'x 179, 181 (3d Cir. 2011) (per curiam) (noting that a court has limited jurisdiction to entertain a motion under section 3664(k) to modify or adjust a restitution order that "does not encompass an attack on the overall validity of a restitution order."); *Young*, 2012 WL 4023773, at *2 (noting that a "Court may, under 18 U.S.C.

36

§ 3664(k), modify [a] payment plan based on a material change in economic circumstances."). However, § 3664(k) does not permit a court to alter the amount of restitution. *See Young,* 2012 WL 4023773, at \*2; *United States v. Nelson*, No. 03-80712, 2013 WL 3381436, at \*2 (E.D. Mich. July 8, 2013).

Nor does 18 U.S.C. § 3664(o)(2) advance defendant's claim.   As mentioned, this subsection provides that a Court may modify an order of restitution pursuant to 18 U.S.C. § 3565 or § 3614.  But, these provisions have no bearing here.  Characterized broadly, 18 U.S.C. § 3565 pertains to the revocation or continuation of probation.   And, 18 U.S.C. § 3614 is titled "Resentencing upon failure to pay a fine or restitution".   It indicates that where "a defendant knowingly fails to pay a delinquent fine or restitution the court may resentence the defendant to any sentence which might originally have been imposed" except that "[i]n no event shall a defendant be incarcerated under this section solely on the basis of inability to make payments because the defendant is indigent." *Id.* §§ 3614(a), (c).  Thus, 18 U.S.C. § 3664(o) does not authorize the Court to alter or otherwise modify the restitution order.

In sum, the Court finds no basis for the relief requested.   Accordingly, defendant's Restitution Motion is denied.

## IV.    Conclusion

For the reasons stated above, I shall deny the Motion, without prejudice, and I shall deny the Restitution Motion.

An Order follows, consistent with this Memorandum Opinion.

Date: October 25, 2022                          _____/s/_____
                                                                Ellen L.  Hollander
                                                                United States District Judge